Fourth Division

December 31, 1997

Nos. 1-95-4163, 1-96-2144 Cons.

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT OF

Plaintiff-Appellee, ) COOK COUNTY.

)

v. ) 

)

GERALD MANUEL, ) HONORABLE

) DANIEL J. KELLEY,

Defendant-Appellant. ) JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court: 

Before his cocaine delivery trial, the defendant Gerald Manuel challenged the admissibility of recordings of his telephone conversations with an informant and a drug enforcement agent.  He was unsuccessful.  At trial, the jury heard the conversations where the defendant negotiated terms and conditions for the sale of cocaine.

After a jury trial, Manuel was found guilty of delivering more than 100 grams, but less than 400 grams, of cocaine in violation of Ill. Rev. Stat. 1991, ch. 56½, par. 1401(a)(2)(B), (now 720 ILCS 570/401(a)(2)(B) (West 1992)).  The sentencing range for this offense is 9 to 40 years.  Manuel was sentenced to 12 years imprisonment.

 After trial, Manuel filed an appeal from his conviction and sentence.  Before any appeal briefs were submitted, however, Manuel filed a 
pro
 
se
 post-conviction petition.  The trial court summarily dismissed the post-conviction petition without an evidentiary hearing.

Now, in this consolidated appeal, we address Manuel's direct appeal from his conviction, as well as his appeal from the denial of post-conviction relief.  We affirm the trial court's orders in both proceedings.

FACTS

At trial, the following evidence was presented:

Chris Robinson (Robinson) was a convicted felon with an extensive criminal history.  Then, between September 1992 and January 1993, he came under investigation for dealing in cocaine.  He made five deliveries to undercover agents during this time period and a warrant was issued for his arrest.

On April 6, 1993, Robinson turned himself in to the FBI.  He later pled guilty to the five deliveries.  He knew he could be facing a sentence of up to 150 years imprisonment because of the five deliveries and his past criminal history.  Therefore, when the FBI asked for his cooperation, he agreed to be an informant in the hope of obtaining leniency.

On April 8, 1993, while represented by legal counsel, Robinson signed an agreement to cooperate with the government law enforcement officers in exchange for a promise that his cooperation would be taken into consideration at the time of sentencing.  Robinson then disclosed information about one of his Chicago drug suppliers, known to him as "Tate," but later identified as defendant, Gerald Manuel.  Robinson said he had been obtaining drugs from Manuel for the past year.  Robinson would purchase between two and 14 ounces of cocaine from Manuel every week or two.  Robinson also socialized with Manuel over the past year.  Their relationship was friendly.

In addition to revealing this source, Robinson agreed to arrange for an undercover agent to purchase cocaine from Manuel and to accompany this agent at the purchase.  Sometime on April 12th or 13th, Robinson paged Manuel from Springfield and, when Manuel called back, made arrangements for this drug purchase.

On April 14th Robinson paged Manuel again, this time from the offices of the Springfield State Police.  Robinson explained that whenever he paged Manuel he entered a special code number -- "223" -- which identified him to Manuel as the caller.  Manuel phoned Robinson at the station.  The conversation was recorded with Robinson's permission.  A tape-recording of this conversation was entered into evidence.

In this conversation, Robinson told Manuel he had a buyer -- a female -- who was willing to purchase ¼ of a "key" or "kilo" of cocaine (about nine ounces) for $7,000.  The $7,000 price apparently was high, but Robinson told Manuel he could "juice" the buyer.  Robinson explained to the jury this meant Manuel could overcharge her.

During this conversation, Robinson told Manuel his last delivery was "no good" and he lost "3Gs" because of the poor quality of the cocaine that was delivered.  Robinson explained to the jury "3Gs" meant $3.000.

On April 15, 1993, Robinson drove to the Chicago area in the company of FBI Agent Ranck and Illinois State Police Officer Marks.  At about 1 p.m., Robinson met Agent Yorli Huff, a female officer for the Northeast Metropolitan Enforcement Group (NEMEG, now called MEG of Cook County), a multi-jurisdictional drug task force.  They met at the Hillside Police Department at 30 Wolf Road.  From this station, Robinson paged Manuel.  Manuel answered the page, calling a phone hooked up to a recording device at the Hillside Police Station.  With the written consent of both Agent Huff and Robinson, their phone conversations with Manuel were recorded.  This recording, too, was placed into evidence.

In this conversation, Manuel agreed to deliver cocaine to Robinson's buyer.  He told Robinson and Huff to meet him at 7650 Greenwood in Chicago.  This location, said Robinson, was a residence where he typically met with Manuel.  Robinson had been there numerous times before.

Robinson, wearing a "body wire" (recording device), rode with Huff to this location.  MEG officers Lewis and Beavers, riding in another unmarked car, were among the approximately 20 State police, Chicago police, and Cook County Sheriff's officers assigned to the operation to provide back-up.

At about 4:15 p.m., Robinson arrived at 7650 Greenwood.  He got out of the car alone and went to the second-floor residence.  Manuel called him there and told him to wait for him.  Robinson went outside for a while, then returned to the residence, and received a second call from Manuel at about 4:30 p.m.  During this second conversation Robinson told Manuel to be sure to bring him four ounces of "raw" (powder cocaine) to make up for his last bad deal.

Robinson went back outside and Manuel arrived at about 5 p.m., riding in a cream-colored Cadillac driven by a man later identified as (co-defendant) Patterson
(footnote: 1).  Patterson went inside the residence, but Manuel met with Robinson in the street and then came over to meet Huff, who was sitting in the car.  After meeting Huff, Manuel told Robinson to follow him.  Manuel got back into his Cadillac with Patterson and drove off.

Robinson attempted to follow, but Patterson began driving fast and "crazy."  Huff called off the deal and the officers re-grouped at a police station at 71st and Cottage Grove.  From this location Robinson again paged Manuel.

Manuel returned the call and Robinson complained about his driving.  Manuel explained that he saw a car following them and thought it might be the police.  Robinson allayed Manuel's fears by explaining that the car following them was Huff's "security."  Having been reassured, Manuel again agreed to go through with the deal.  He told them to meet him in the Walgreen's parking lot at 127th and Halsted.

Officer Judge testified at trial.  He was part of the surveillance team providing back-up for the drug purchase.  Before Robinson and Huff arrived at the Walgreen's parking lot, Officer Judge noticed a blue Nissan Maxima, with license plate number WXH 925, enter the Walgreen's parking lot.  A man he identified as Patterson drove the car into the lot, parked it, and then got into a cream-colored Cadillac.  The officer identified Manuel as the driver of the Cadillac.  The Cadillac then left the parking lot.  Later, at about 6 p.m., Robinson and Huff pulled into the parking lot.

According to Robinson's testimony, MEG agents Lewis and Beavers, who had been identified as Huff's "security," followed them into the Walgreen's parking lot.  Soon the cream-colored Cadillac pulled into the lot.  Patterson got out of the Cadillac and went into the Walgreen's store.  Manuel walked over to Robinson and asked to meet Huff's "security."  Huff and Robinson then brought Manuel over to the other car, where he shook hands with Officer Lewis.  Officer Lewis showed Manuel a black money bag containing $7,000.  He did not turn over the money to Manuel.

Manuel, Robinson testified, seemed uneasy.  He walked around the officers' car and suggested that Huff's "security" looked like detectives.  Nevertheless, he walked back to Robinson's car with Robinson and Huff, got in, and negotiated with Huff for the sale of the cocaine.

Huff told Manuel she would not pay until she saw the drugs.  Manuel handed a car key to Robinson and told him the key belonged to the blue Nissan Maxima parked in the lot.  The drugs were in the car, he said.  The three of them exited Robinson's car.  With Manuel's permission, Robinson gave the key to Huff and she walked over to the Maxima.  When Huff started to open the passenger compartment of the car, Manuel corrected her and told her to open the trunk.  Huff opened the trunk, but it appeared empty.  Then Manuel came over and pulled up the lining in the trunk to expose a brown paper bag.  Huff retrieved the bag from the trunk and looked inside.  She saw two plastic bags, one containing off-white or brownish "chunks," and a second containing an off-white powder.

Huff said the stuff "looked good."  This was a signal to the many officers in the area to move in and effect the arrest of Manuel and Patterson.  Within minutes, both Manuel and Patterson were arrested in the Walgreen's parking lot.  Neither of them was found to be in possession of any weapons.

 Along with the testimony of Agent Huff, Agent Lewis, and Chris Robinson, the State presented the testimony of Richard Paulas, Assistant Director of the Illinois State Police Lab at Maywood.  In 1993, he had been working as a forensic chemist at the facility and performed identifying tests on the substances Agent Huff recovered from Manuel and suspected to be cocaine.  Paulas testified that the "chunky" off-white substance found in the plastic bag marked as exhibit 3A weighed 243.0 grams.  Further tests indicated that the substance contained cocaine in a "free base" form.  The other plastic bag, marked as exhibit 3B, contained a more powdery substance.  This, too, tested positive for the presence of cocaine, in a "salt" form.  The form of the cocaine, Paulas explained, accounted for the different ways the two substances reacted to the various tests.

Paulas did not determine the purity of the substances and did not know the percentage of cocaine in the two samples.  He testified only that both substances tested positive for the presence of cocaine in each of the three confirmation tests he performed.

In addition to the live witness testimony, the State offered into evidence the tape recordings of phone conversations Manuel had with Robinson and Agent Huff, as well as recordings obtained from the body wire worn by Robinson during the course of the drug transaction.  A certified copy of Manuel's application for license number WXH 925, registered to a blue Nissan Maxima, also was admitted into evidence.

The following stipulation by the State and defense counsel also was entered:

"It would be stipulated between the parties, the People of the State of Illinois and the defense, between defense counsel Deborah Grohs and Kevin Smith, that the recordings and conversations were made pursuant to Chapter 725, Illinois Compiled Statues, Article 108A, and that Larry Wayne, AKA Chris Robinson, consented for all recorded conversations, and the conversations were recorded on April 14, 1993, and April 15th, 1993, and the equipment to record the conversations was in proper working condition, and accurately recorded the conversations on tape, and the chain of custody of all tape recordings was correct and proper at all times, and that each original tape contains an accurate recording of the conversations that occurred, that all copies of the tapes are true and accurate reproductions of the original tapes, and that Northeast Metropolitan Enforcement Group Agent Yorli Huff and Larry Wayne, AKA Christopher Robinson, listened to all of the tapes and assisted in the preparation of the transcripts of all."

The defense presented no witnesses.  After hearing arguments by counsel and instructions from the court, the jury found defendant guilty of delivering more than 100 grams, but less than 400 grams, of cocaine.

A post-trial motion was filed.  Before sentencing, the trial court addressed this motion, refuted each and every issue raised, and denied the motion for new trial.  Manuel then was sentenced to 12 years imprisonment.

DECISION

Motion to Suppress State's Use of Audiotapes

The first issue on appeal is whether the trial court erred when it refused to suppress the audio tape-recordings of conversations between Manuel and the confidential informant, Chris Robinson.  Manuel contends the State did not comply with the requirements of article 108A-3 of the Code of Criminal Procedure (725 ILCS 5/108A-3 (West 1994)), when it obtained judicial approval for the use of an eavesdropping device.

Article 108A-3 states, in pertinent part:

"(a) Where any one party to a conversation to occur in the future has consented to the use of an eavesdropping device to overhear or record the conversation, a judge may grant approval to an application to use an eavesdropping device pursuant to the provisions of this section.

Each application for an order authorizing or subsequently approving the use of an eavesdropping device shall be made in writing upon oath or affirmation to a circuit judge, or an associate judge assigned for such purpose pursuant to Section 108A-1 of this Code, and shall state the applicant's authority to make such application.  Each application shall include the following:

      ***

(2) ***(c) the identity of the party to the expected conversation consenting to the use of an eavesdropping  device"

In the present case, the confidential informant, Chris Robinson, gave written consent to the overhear and recording of conversations he had with the defendant.  However, the article 108A-3 application stated that "Larry Wayne (alias)" was the consenting party.  Also, the consent form Robinson signed identified Robinson as "Larry Wayne (alias)" and that is how Robinson signed the form.

Manuel contends that the State's use of an alias when identifying Robinson as the consenting party was legally insufficient and the trial court should have suppressed all audio tape-recordings to which Robinson consented.

In response, the State argues the trial court properly admitted the audiotapes into evidence.  The court's ruling, says the State, may be supported for three separate reasons: (1) the State was not required to obtain section 108A-3 judicial approval for these recordings, so any alleged defect in the application is immaterial; (2) identifying the consenting party by an alias is legally sufficient under section 108A-3; and (3) even if the article 108A application was not legally proper, the error was harmless.

In 
People v. Herrington
, 163 Ill. 2d 507, 645 N.E.2d 957 (1994), the supreme court reversed the trial court's suppression of an audiotape obtained under conditions nearly identical to this case.  The 
Herrington
 court ruled that the audiotape of the conversation between the victim of a sexual offense and the perpetrator was admissible without article 108A authorization, where the victim telephoned the perpetrator from the police station, at the direction of the police, and the conversation was recorded with the victim's permission.

Reading into the eavesdropping statute (720 ILCS 5/14-2 (West 1994)) an exclusion where the person consenting to the recording is also a party to the conversation, the 
Herrington
 court said,

"The recording of a conversation 
by a party to that conversation
 was simply a means of preserving a more accurate account of what he had heard." (Emphasis added.)  
Herrington
, 163 Ill. 2d at 510.

See also 
People v. Siwek
, 284 Ill. App. 3d 7, 671 N.E.2d 363 (1996) (where consent is given by one party to the conversation, the other party has no legitimate expectation of privacy and eavesdropping does not occur).

Even if we were to ignore the clear directive of 
Herrington
 and interpret the eavesdropping statute as requiring article 108A judicial authorization where the conversation is being recorded for law enforcement purposes, and the targeted subject is unaware of the recording of his conversation, there is no basis for suppressing the audiotapes in this case.  The State applied for and obtained article 108A authorization for recording Manuel's conversations with Robinson.  We find no principled reason for invalidating the judicial authorization that was granted simply because the State's application identified the consenting party by an alias.

 The statute states that the application must include "the identity of the party to the expected conversation consenting to the use of an eavesdropping device."  The statute does not require the consenting party to be identified in any particular way.

A defendant's Fourth Amendment rights are not abridged when an affiant to a search warrant uses a fictitious name.  See 
People v. Stansberry
, 47 Ill. 2d 541, 268 N.E.2d 431 (1971); 
People v. O'Kiersey
, 46 Ill. 2d 198, 263 N.E.2d 488 (1970).  An affidavit given for the purpose of obtaining article 108A authorization for recording a defendant's conversations is analogous to an application for a search warrant.  The affiant's use of an alias is acceptable where the issuing judge is told the name is fictitious.

There is no allegation that the informant does not exist, nor is there any doubt that Robinson exists, since he testified at trial.  Also, there is no question that the judge issuing the article 108A authorization was aware that the affiant's name was an alias, since that fact was noted in the affidavit.  

The informant did not provide reasonable grounds for the judge's order.  He was not asked to.  That information came from law enforcement agents.  The only purpose of the informant's affidavit was to establish that one party to the anticipated conversations in fact consented to the recording.  At trial, the defense stipulated to the fact that "Larry Wayne, AKA Chris Robinson," consented to the recording of his conversations with Manuel.

Since the purpose and reasoning behind requiring article 108A authorization were satisfied and the State gained no tactical advantage by using an alias, any technical defect in the State's compliance with the statutory requirements of article 108A does not require suppression.  See 
People v. O'Toole
, 226 Ill. App. 3d 974, 590 N.E.2d 950 (1992)(where the error could not have altered the trial court's determination that an eavesdropping device should have been authorized, the error doesn't require suppression); 
People v. Rogers
, 141 Ill. App. 3d 374, 490 N.E.2d 133 (1986).

For all the reasons stated above, the motion to suppress was properly denied.

Other Crimes Evidence

In his second issue on appeal, Manuel contends that the trial court erred in allowing the State to introduce "other crimes" evidence, 
i.e.
, evidence of his previous drug deals with Robinson.  The trial court ruled that this evidence was admissible as "course of conduct" evidence.  We agree.

This writer has addressed the issue elsewhere:

"Any analysis of FRE 404(b) must be confined to 
other
 crimes, wrongdoings, or acts.  That is, the conduct must have been 
extrinsic
 to the matter being tried, not contained in it, not part of it.  Courts also call this extrinsic conduct evidence "other acts" or "uncharged misconduct" evidence.  For example, a defendant's prior heroin sale to Adam is extrinsic to the charge that he sold heroin to Baker.  The prior sale may be offered to prove the defendant's knowledge or intent in connection with the sale to Baker.  It may not be offered as character evidence, that is, to show he is the kind of person who is more likely to have made the sale to Baker.

When the prior conduct is 
intrinsic
 to the matter being charged, belonging to it, part of it, or, as some cases say "inextricably intertwined" or a "continuing course of conduct," FRE 404(b) is not implicated, and the general principles of relevance apply.  Intrinsic evidence can be part of the episode being tried, or it can consist of necessary preliminaries to the matter being tried."  Mauet, Wolfson, 
Trial Evidence
, ch. V, p. 102 (1997).

Illinois has adopted the same treatment of "other crimes" evidence.  See 
People v. Bartall
, 98 Ill. 2d 294, 456 N.E.2d 59 (1983); 
People v. Davis
, 248 Ill. App. 3d 886, 891, 617 N.E.2d 1381 (1993) ("other offenses" or "extrinsic acts" evidence includes not just offenses but other bad or wrongful acts and may not be admitted to demonstrate defendant's propensity to commit the crime charged, but may be admitted if it is relevant to establish any other material question).  See also, 
Cleary and Graham's Handbook of Illinois Evidence
 (6th edition 1994), article IV, § 404.5, p. 218: 

"Moreover, where the evidence of the act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and the rule relating to 'other crimes' evidence is not implicated, simply because such evidence formed an integral and natural part of the witness's account of the circumstances surrounding the offenses for which the defendant was indicted."

In the present case, Robinson's testimony, as well as the references in the audiotapes to Robinson's previous drug deals with Manuel, were not, strictly speaking, "other crimes" evidence.  Though the prior deals were not part of the same episode, they were a necessary preliminary to the current offense.  Thus, the rules of evidence concerning "other crimes" evidence was not implicated and the evidence was admissible under ordinary relevancy principles.

In this case, the evidence was relevant to show Manuel's course of conduct and his illicit relationship with Robinson.  Though defense counsel did not actually raise an entrapment defense, references were made to defendant being "ensnared" by the government and to Robinson's desire to cut himself a better deal.  The State was entitled, therefore, to show Manuel's willingness to be involved with someone he had been dealing with.

The evidence also provided an explanation of an aspect of the crime not otherwise understandable.  That is, the conversations regarding the prior sale of cocaine to Robinson in which the quality of cocaine had been bad explained why Manuel delivered an additional four ounces of cocaine in addition to the nine ounces of cocaine bargained for by Huff.

Even if the evidence were "other crimes" evidence, it would be admissible if offered for any purpose other than to establish character and propensity to commit the crime.  See 
People v. LeCour
, 273 Ill. App. 3d 1003, 652 N.E.2d 1221 (1995).  Intent, knowledge, purpose, motive, common design, plan, scheme, absence of mistake, opportunity or preparation, or the circumstances of the crime that would be otherwise unclear are proper and valid reasons for admitting "other crimes" evidence.  
People v. Kimbrough
, 138 Ill. App. 3d 481, 485 N.E.2d 1292 (1985).

Whether we analyze the admission of the evidence of prior drug deals with Robinson as "other crimes" evidence or merely assess the evidence under normal relevancy standards, we find no abuse of discretion in the trial court's decision to admit this evidence.

Audiotapes and their transcripts

The next two issues concern the audiotapes and their transcripts.  Defendant contends that the trial court erred because it allowed the jury "unlimited access" to the transcripts throughout trial and because it did not instruct the jury the transcripts were not evidence.  Manuel also complains the trial court should not have allowed the audiotapes to go into the jury room during deliberations.

With regard to the transcripts, we find no abuse of discretion in the trial court's actions.  When the transcripts were first distributed to the jurors during Robinson's testimony, defense counsel complained to the judge that the jurors were reading them instead of listening to the testimony.  The court refused to take the transcripts away because the State said the transcripts were going to be used during Robinson's examination.  Defense counsel then asked for alternative relief --- that the jury be instructed to stop reading the transcripts until directed to do so.  The court instructed the jury according to counsel's suggestion.

Later on, when the State completed its examination of Robinson, defense counsel again complained that the jury had been reading the transcripts even when the audiotapes were not being played.  The court said, "I wish you would have said something before."  The court then immediately had the transcripts collected from the jury.

The trial court, in granting the alternative relief, corrected the problem perceived by defense counsel.  Later, when the same problem was brought to his attention, the transcripts were removed.

There is no evidence of prejudice stemming from the court's rulings, nor does defendant suggest in what way he was prejudiced.  We find nothing inappropriate about the court's actions.  We also note defendant has not cited a single case in support of his claim that the court erred.

In addition, the trial court properly instructed the jury with regard to the transcripts.  First, when the trial court distributed the transcripts to the jurors, it told them the transcripts were to be only used as an aid and were not to be considered evidence themselves.  Later, at the close of the trial, the court instructed the jurors to disregard testimony or evidence that had been refused or stricken; that evidence received for a limited purpose should not be considered for any other purpose; and the evidence to be considered consisted only of the testimony and exhibits entered into evidence.  The transcripts were not entered into evidence or provided to the jury during deliberations.  It should be noted, too, that defense counsel never requested a specific instruction regarding the transcripts at the close of trial.

Because the instructions given by the court, taken as a whole, properly instructed the jurors regarding the evidence, there was no error caused by the court's failure to specifically instruct the jurors, at the close of trial, that the transcripts were not evidence.

We also find no error in the trial court's exercise of its discretion when it decided, over defense objection, to send the audiotapes in with the jury during deliberations.  We see no reason to treat audiotapes any differently than other evidentiary exhibits.  Such evidence may be used by the jury during 

deliberations at the discretion of the trial court.  
People v. Rogers
, 123 Ill. 2d 487, 528 N.E.2d 667 (1988) (the decision of whether to allow the jurors to take exhibits into the jury room is left to the sound discretion of the trial court).

In this case, the defense made several claims regarding the quality of the tapes and suggested that the State "created" the  transcripts because the tapes were not understandable.  Under these circumstances, it was appropriate for the jurors to have access to the tapes during deliberations so that they could determine, for themselves, the extent to which the tapes confirmed the State's claim that defendant willingly was involved in the delivery of an illegal substance.

Sentence

Defendant contends the trial court abused its discretion when it sentenced him.  He claims the trial court relied on two improper aggravating factors -- the seriousness of the societal harm caused by drug-related crime and the compensation he received for committing the crime.  These factors are implicit in the offense, says defendant, and should not have been considered in aggravation.  Defendant also contends that the trial court failed to consider his rehabilitative potential -- the fact he had no prior convictions or juvenile record and had previously attended college --- when imposing sentence.

As the State points out, no post-sentencing motion was filed in this case and under the mandates of section 5-8-1(c) of the Unified Code of Corrections (730 ILCS 5/5-8-1(c)), as interpreted by the supreme court in 
People v. Reed
, 177 Ill. 2d 389, 686 N.E.2d 584 (1997), this issue is waived.

Even if the issue were not waived, the record does not support defendant's position.  The record shows during the sentencing hearing defense counsel suggested to the court that a number of factors in mitigation were present, but that 
none
 of the aggravating factors existed.  In response, the court indicated that it saw things differently.  Then the court went through the list of aggravating factors, commenting on each.   Though no one was "injured" by this offense in the traditional sense, the court said that the sale of drugs causes harm to everyone in the chain of purchase, including children.  The court also found the second aggravating factor -- receiving remuneration -- applied since Manuel was in the business of selling drugs for profit.  The court also noted the evidence indicated Manuel had been in the drug business for some time.  Though Manuel had no prior arrests or convictions, the court said it could not ignore the evidence of Manuel's criminal history  -- that this was not a one time, isolated incident.  The court also considered that no one induced or forced Manuel to commit the crime.

There is nothing in the court's comments which indicate it improperly emphasized any of the aggravating factors.  The court's remarks indicate only that it was taking into account the nature of the offense.  Nor did the court fail to consider Manuel's rehabilitative potential.

A trial court's decision on the proper sentence to be imposed, especially when it is within the statutory range, is entitled to great deference.  
People v. Miller
, 286 Ill. App. 3d 297, 676 N.E.2d 309 (1997)
.  The trial judge is in a better position to assess the situation and determine a proper sentence.  On review, it is presumed the trial court gave proper consideration to all factors, including rehabilitative potential, and the defendant has the burden of affirmatively showing the contrary.  
Miller
, 286 Ill. App. 3d at 304.  A sentence will not be altered on review unless the trial court abused its discretion.  
People v. Streit
, 142 Ill. 2d 13, 19, 566 N.E.2d 1351 (1991).

There has been no affirmative showing the trial court used improper reasoning when fashioning a sentence, nor do we find the court abused its discretion by imposing a 12 year sentence when the statutory range was between 9 and 40 years.

Appeal of the Dismissal of the Post-Conviction Petition

In the consolidated appeal from the dismissal of Manuel's post-conviction petition without an evidentiary hearing, Manuel argues only one issue: the ineffective assistance of trial counsel.  He contends his trial counsel was ineffective because (1) a "fatally flawed" entrapment defense was presented, (2) no investigation was made regarding the whereabouts of the blue Nissan Maxima, and (3) the cross-examination of State witnesses was "meaningless."

In 
People v. Olinger
, 176 Ill. 2d 326, 341-42, 680 N.E.2d 321 (1997), our supreme court said:

"A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right; rather an evidentiary hearing is required only when the allegations of the petition, supported by the record or accompanying affidavits, makes a substantial showing of a violation of a constitutional right."

The only constitutional right defendant claims he was denied is the effective assistance of counsel.  In order for a defendant to succeed on a claim of ineffective assistance of counsel, however, he must show (1) that his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance so prejudiced defendant that there is a reasonable probability that the outcome of the trial would have been different without counsel's errors.  
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed.2d 674, 104 S. Ct. 2052 (1984); 
People v. Simms
, 168 Ill. 2d 176, 659 N.E.2d 922 (1995).  A reviewing court may reject a claim of ineffective assistance of counsel by finding that defendant was not prejudiced by counsel's representation without determining whether counsel's performance was deficient.  
People v. Lear
, 175 Ill. 2d 262, 677 N.E.2d 895 (1997); 
People v. Erickson
, 161 Ill. 2d 82, 90, 641 N.E.2d 455 (1994).

The first argument -- that one of counsel's "main focus" was an entrapment defense -- is not supported by the record.  As defendant acknowledges, counsel never said the defense would  rely on entrapment.  To show that one of counsel's "main focus" was entrapment, defendant makes reference to a single statement by counsel.  We have reviewed the transcripts of this two-day trial.  The record does not support defendant's claim that this isolated reference to entrapment constituted a "focus" on entrapment as a defense.

The next point --- counsel's failure to investigate the whereabouts of the blue Nissan Maxima --- is irrelevant.  In his argument, Manuel merely speculates that the Maxima was an "evidentiary key to the defense."  There is nothing to support this claim, nor can we imagine in what way the Maxima could have assisted Manuel's defense.  Simply, counsel's failure to investigate this collateral matter could not be evidence of a deficiency.

Lastly, Manuel claims trial counsel's cross-examination of State witnesses was "meaningless."  Once again, however, the record does not support Manuel's claim.  In fact, during the cross-examination of Huff, counsel succeeded in showing her hostility to the defense by her reluctance to answer simple questions.  The court commented on this and rebuked the witness for her obstructionist attitude.  This may have been defense counsel's strategy -- to decrease this witness's credibility in the eyes of the jurors and to curry some sympathy. 

In light of the overwhelming evidence, defense counsel was left with little else to do.  In any event, we cannot say the record demonstrates trial counsel failed to subject the State's case to "meaningful adversarial testing."  See 
People v. Nunez
,  263 Ill. App. 3d 740, 635 N.E.2d 718, (1994).  

Since there is no basis to defendant's claim that he received ineffective assistance of counsel, it was not error for the trial court to have dismissed the post-conviction petition without an evidentiary hearing.

CONCLUSION

Defendant Gerald Manuel's conviction for the delivery of more than 100 grams, but less than 400 grams, of cocaine and the 12 year sentence imposed are affirmed.  The trial court's 

dismissal of defendant's post-conviction petition is also affirmed.

AFFIRMED.

CERDA, P.J. and McNAMARA, J., concur.

FOOTNOTES
1:
Patterson's bench trial for the same offense was held simultaneously with Manuel's jury trial.